# IN THE OREGON TAX COURT
## MAGISTRATE DIVISION

Albert J. KAILES,
Trustee,
*Plaintiff,*

*v.*

JOSEPHINE COUNTY ASSESSOR,
*Defendant.*

(TC-MD 980876 (Control); 9909664C)

KAILES ENTERPRISES, INC.,
The Albert J. Kailes Family Trust,
and Albert J. Kailes, Trustee,
*Plaintiffs,*

*v.*

JOSEPHINE COUNTY ASSESSOR,
*Defendant.*

(TC-MD 982945C, 000613C)

Christopher Robinson, Lake Oswego, argued the cause for Plaintiff.

Leah Harper, Josephine County Assistant County Counsel, Grants Pass, argued the cause for Defendant.

Decision rendered in part for Plaintiff and in part for Defendant March 16, 2001.

### DAN ROBINSON, Magistrate.

Plaintiff appealed the real market value of a medium size commercial building in Grants Pass for tax years 1996-97, 1997-98, 1998-99, and 1999-2000. The property is identified in the Josephine County Assessor's records as Account No. R336988 (Map No. 36-0516-34-000403-00).[1]

A trial was held July 31 and August 1, 2000, in Salem. Christopher Robinson, Attorney at Law, represented Plaintiff. Defendant was represented by Leah Harper, Assistant County Counsel, Josephine County. Testifying for Plaintiff was Richard S. Jacobson, MAI; Todd Liebow, MAI; Kirk Taylor, Commercial Real Estate Broker; and Randy Simonsen, Commercial Real Estate Broker and CPA, who was involved in marketing the subject property since February 1999. Witnesses from the Josephine County Assessor's Office were Robert A. Spohn, a state certified appraiser and Supervisor of the Commercial Appraisal Section; Michael Schneyder, Chief Appraiser; and George Trahern, Assessor.[2]

---

[1] The account number in tax year 1996-97 was 303-698-83.

[2] The court has learned that Trahern retired after the trial but prior to the issuance of this Decision and that Schneyder has become the assessor.

## STATEMENT OF FACTS

The subject property is a former Ernst retail store located on a level 4.46-acre parcel zoned for general commercial use and is on the corner of two major thoroughfares in Grants Pass just off Interstate 5. The structure is a 46,192 square foot steel frame building with tip-up concrete exterior walls that was built in 1994.[3] There is a 1,534 square foot mezzanine office area inside the store. Attached to the side of the building is a covered storage area (for lumber, nursery stock, etc.) with a paved surface and in the front a 3,210 square foot greenhouse that is separately heated and cooled. The building is served with a sprinkler system, which, according to Spohn became inoperative at some point. There is graffiti on the exterior walls, trash in the lot, weeds in the grass areas, and a broken light in the parking lot. The total building footprint is 61,311 square feet.

The real market value on the assessment and tax rolls for all four tax years is $3,289,480 and the assessed values are $3,289,480 (1996-97); $2,960,530 (1997-98); $3,049,350 (1998-99); and $3,140,830 (1999-2000).

In June 1994 GI Joes, Inc., sold the unimproved land to Birtcher VDL for $784,790. According to Jacobson's appraisal, the building was constructed at a cost of $2,245,117 ($48.60/sq. ft.). In October 1994, Birtcher VDL sold the property to Kailes Enterprises, Inc. (Kailes Enterprises) for slightly more than $4,000,000,[4] with Ernst Home Centers (Ernst) in tow, committed to a 20-year lease at an initial rent of $9.05 per square foot annually. The building was a "build to suit" for Ernst and the parties agree it rented above market.

Ernst occupied the property for two years before vacating in October 1996 after filing bankruptcy earlier that year. In December 1996, after Ernst vacated the premises,

---

[3] Plaintiff's two appraisers measure the building as 46,192 square feet. Defendant's appraiser, Spohn, reports the main enclosed structure to be 45,625, with a 1,534 square foot mezzanine area. The difference is less than 1,000 square feet. The court used 46,192 in its calculations.

[4] According to Defendant's Exhibit 101 at page 7, the improved property sold for $4,061,252. An April 1997 appraisal by Richard Jacobson, MAI, reports the sale price at $4,096,566.

Kailes Enterprises sold the property to Albert J. Kailes, trustee for the Albert J. Kailes Family Trust. The stated consideration was $2,550,000. The property has been unoccupied since Ernst vacated in 1996.

The property has been continually listed for sale since November 1996 at prices ranging from $4,132,000 (Jan 13, 1998) to $3,600,000 (present). Staples offered to lease one half of the building in early 1997 at $10 per foot provided Plaintiff paid for tenant improvements of $20 per foot. Purchase offers of $2.65 million, $2.75 million, and $2.85 million were received between July 1999 and July 2000.

Highest and best use of the property is as a retail facility or perhaps office space. The parties disagree as to the likely use, however. Plaintiff asserts that the property will lease-up faster, and at a higher rent, if divided into two smaller spaces of roughly 20,000 and 26,000 square feet. Defendant contends that a single occupant is most likely. The costs associated with the change to multi-tenant use, estimated by Plaintiff to be between $100,000 and $115,000, are among the items disputed.

The parties agree that general economic indicators for Josephine County and specifically the city of Grants Pass have been fairly strong. Commercial development has been particularly strong, with the construction of numerous retail outlets since 1996. Those properties include Factory 2 U (16,400 sq. ft.), Grocery Outlet (22,990 sq. ft.), Big 5 (9,625 sq. ft.), Wal-Mart (122,622 sq. ft.), Fred Meyer (153,900 sq. ft.), and Albertsons (51,245 sq. ft.). Gottschalks entered into a new lease in calendar year 2000, replacing Montgomery Wards as the anchor for the Grants Pass Shopping Center.

There are three appraisal reports in evidence, two of which were submitted by Plaintiff. Jacobson, MAI, valued the property for the lender (Bank of America) in April 1997, six months after Ernst vacated. He concluded that the stabilized value of the fee simple interest was $3,560,000. However, after deducting the costs associated with "leasing the building, and bringing it to full occupancy, and less a profit to the buyer for risking capital and buying a somewhat specialized vacant building in a moderate market," Jacobson concludes with an "as-is" value of $2,390,000.

Plaintiff's other appraisal report was prepared by Todd Liebow, MAI, in July 2000, for this appeal. Liebow estimated the market value of the property "upon renovation" at $2,900,000. Liebow also adjusted his market value conclusion for certain "stabilization costs" and concludes with an "as is" value of $1,300,000 as of January 1, 1999. His estimate for the earlier tax years is $1,350,000 for tax years 1998-99 and 1997-98 and $1,670,000 for the 1996-97 tax year. Liebow also prepared a written appraisal review of Jacobson's report and concludes that an adjustment for "ownership-borne tenant improvement costs" results in an "as-is" value of $1,470,000.

Defendant's appraiser, Spohn, estimated the value at $2,960,000 as of July 1, 1996, $3,038,000 as of January 1, 1997,[5] $3,113,000 as of January 1, 1998, and $3,191,000 as of January 1, 1999. As with Liebow and Jacobson, Spohn placed primary reliance on the income approach because of the quantity and quality of the available market data. Spohn made no adjustments for stabilization costs but did subtract $70,000 for deferred maintenance for all years except 1996-97.

## ANALYSIS

The participants involved in the presentation of this case are all knowledgeable professionals, skilled in their respective disciplines of law and appraisal. Seven witnesses testified over the course of the one and one-half day trial. Much technical information was presented. Although there is a considerable amount of controversy as to the outcome, there is much agreement.

The parties essentially agree on the "stabilized" value for the 1999-00 tax year of $3 million utilizing the three standard approaches to value.[6] Moreover, each appraiser

---

[5] Spohn estimates the value for tax year 1997-98 as of January 1, 1997; however, the assessment date for that year was July 1, 1997. Or Laws 1997, ch 451, § 4; *See Note following* ORS 308.210 (1997).

[6] Liebow estimated the value at $2,900,000 as of January 1, 1999, and Defendant's appraiser, Spohn, concludes with a value of $3,191,000 for the same period. Jacobson's 1997 bank appraisal concludes with a higher stabilized value of $3,560,000, primarily because he used a higher market rent ($8 vs. $7) and a lower capitalization rate (9.5 percent vs. 10 percent). The court finds that difference

places primary reliance on the income approach to value, and the parties are in agreement on a market rent of roughly $7 per square foot annually and a capitalization rate of 10 percent. Finally, all of the appraisers agree that a lease-up period of two years was anticipated by 1999. (Jacobson used a lease rate of $8 per foot and a one year absorption period in April 1997 based on market activity up to that point.)

The big dispute is over the appropriateness, in terms of appraisal theory and methodology, of making an adjustment for so-called "stabilization costs." Both of Plaintiff's appraisers subtracted certain costs in excess of $1 million from the stabilized value. Liebow deducted $1,600,000 (rounded) as follows:

| | |
|---|---|
| Absorption Costs (lost rent): | $563,726 |
| Leasing Commissions: | $121,254 |
| Tenant Improvements: | $913,203 |

Jacobson subtracted $1,170,000 (rounded) as follows:

| | |
|---|---|
| Taxes, insurance, maintenance: | $ 47,711 |
| Holding Costs (lost rent): | $280,850 |
| Leasing Comm's: | $138,576 |
| Bldg. Renovation: | $100,000 |
| Entrepreneurial Incentive:[7] | $603,791 |

Plaintiff's counsel insists those adjustments are necessary because the subject is a "problem property." Defendant disagrees with that view.

*Highest and Best Use*

■ As a preliminary matter, the court will first address the issue of highest and best use. Both Liebow and Jacobson conclude the property should be divided into two roughly equal spaces because of the higher demand for smaller spaces (10,000 to 30,000 square foot range versus 45,000 square foot

---

understandable given the market perspective shortly after Ernst, a nationwide retailer, vacated, and the market perspective of the same vacant building some three years later, without a tenant during the three-year interval.

[7] Entrepreneurial incentive was calculated from the "Stabilized value to Developer" of $ 2,956,209 subtracted from the stabilized value of $3,560,000.

spaces) and because of the potential to achieve higher rents of $7 versus $5 to $6 per foot annually. Defendant disagrees, arguing that there is no market evidence that a single tenant cannot be located to occupy the entire space. As the Oregon Supreme Court noted some years ago, "[t]he question whether an immediate market exists for a building at a particular use is separate, however, from the question whether that use is highest and best." *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 726 (1990). Highest and best use has been defined as "the reasonable and probable use that will support the highest present value as of the valuation date." *US Nat'l Bank of Oregon v. Dept. of Rev.*, 8 OTR 256, 268 (1980). The court finds ample evidence to support Plaintiff's position and concludes the highest and best use as improved is to divide the building into two spaces. The county further claimed, through the testimony of Spohn, that for tax purposes the assessor's office is required to appraise the property as it exists and that a division is simply too speculative. The court disagrees with the county's conclusion. *See Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 882 P2d 591 (1994).

*Problem Property*

■■ Next the court considers Plaintiff's contention that the subject is a problem property. The term "problem property" does not appear to be a technical one within the appraisal community. At least, the phrase is not found in *The Dictionary of Real Estate Appraisal* (3rd edition 1993). Rather, it appears to be a colloquialism used to describe certain properties with negative factors that detract from value. The term is found in a leading appraisal treatise, which Plaintiff's counsel submitted into evidence. Plaintiff points to the following example:

> "One type of problem property is a property that has not achieved the level of utility for which it was designed and consequently is a financial failure, e.g., a strip shopping center that did not meet a breakeven occupancy level and thus has not generated the necessary cash flow to pay debt service or provide a return on the investment. * * * A third type is a development that carries high risk because of its

size or complexity, e.g., a timeshare resort project, a large mixed-use development."

Appraisal Institute, *The Appraisal of Real Estate* 580 (11th ed 1996) (hereinafter *The Appraisal of Real Estate*).

From that description, the court concludes that the subject property is in fact a problem property, at least for two of the tax years at issue. Hindsight, of course, reveals a problem in that the property has remained vacant and for sale (or lease) for nearly four years after housing a tenant for only two years. Defendant asserts that the owner is and has been asking too much for the property, which has prevented a quicker sale. Whether that is true or not, the passage of time without a sale or lease likely stigmatized the property, which in turn decreases its value. *See The Appraisal of Real Estate* at 591. Moreover, after one failed offer to lease roughly half the building in early 1997, no lease or purchase offers were submitted for two years. During that two-year period several competing properties came under lease. Additionally, three contingent purchase offers between April 1999 and April 2000 all fell through because the buyer was unable to find a tenant. Liebow testified that the market for that size property was oversupplied in 1997, but had "tightened up" by the time of trial in 2000. Moreover, Liebow testified that of the retailers likely to rent that space, those "who want to be there are already there" (under a lease in a nearby space), a factor that has curbed demand. Finally, the parties agree that a two-year absorption period was likely. For those reasons, the court concludes the subject property was a problem property by January 1, 1998, and has remained a problem since then.

Defendant disagrees with the problem-property analysis because two other properties in the area with similar space available for lease both found tenants during this time period and because sales of existing properties of various sizes, plus new construction in the general area, which has been rather extensive, demonstrate an active market during the relevant time period. However, a projected lease-up period of one to two years in an active market, along with the lack of any purchase offers for several years, and the likelihood of having to divide the building, strongly suggests a problem.

*Methodology*

The next question is whether Plaintiff's methodology for addressing the problem is sound. The adjustments generally fall into two categories, both of which involve an element of risk: lost rent during the lease-up, and tenant improvements. The court begins with the observation that risk is typically reflected in the capitalization rate. *The Appraisal of Real Estate* at 450. That approach is supported by the Supreme Court's decision in *Ernst Brothers*. However, sufficient market data is necessary.

There is some support for Plaintiff's approach in the literature. The discussion of problem properties in *The Appraisal of Real Estate* indicates that "the appraiser often must estimate value at multiple points in time, i.e., as the property exists, upon completion * * * and upon achievement of a stabilized condition." *Id.* at 580. The authors go on to explain that "[t]he determination of economic feasibility requires a market value estimate of the property as currently existing (its 'as is' value) and a value estimate at a prospective time—i.e., upon completion of some phase of construction, achievement of a stabilized condition, or both." *Id.* at 581. In a property value appeal, the estimate must be tied to the relevant assessment date(s). That was the goal of Plaintiff's appraisers and appears to the court to be a sound approach in this case.

*Lost Rent*

■  *The Appraisal of Real Estate* discusses rent loss in the context of a proposed multi-tenant project that is not fully leased. In that situation, the authors note that "[t]he appraiser should account for the impact of the rent lost while the building is moving toward stabilized occupancy." *Id.* at 590. Several approaches are set forth regarding how the appraiser can account for the loss of rent. One recommended technique is to "discount[ ] the net income loss during lease-up, which is then deducted from the value of the property at stabilized occupancy." *Id.* Both of Plaintiff's appraisers did just that. The amount each appraiser deducted differed because they used different lease-up periods (one year versus two). The court finds no practical reason why the same approach would not be valid for the subject building with no

tenant(s), because each situation presents the same problem. The risk inherent with Plaintiff's property is accentuated by the fact that it is a one or two tenant property. As such, the absence of a tenant has a dramatic impact on income and, in a market with lengthy lease-ups, a significant impact on value.

The appraisers all agree (including those from the assessor's office) that it would take at least one year to find a tenant for the subject property. The court believes the market would have anticipated lost rent and reacted by settling on a lower value. Because it is an accepted appraisal practice in this situation to subtract the present value of the lost rent from the stabilized value of the property, the court finds it appropriate to make an adjustment for rent loss. The court accepts an adjustment based on a two-year rent loss projection for tax years 1998-99 and 1999-2000 and one year for tax years 1996-97 and 1997-98. As explained more fully below, the adjustment for tax year 1996-97 is appropriate because of the definition of real market value that year.

Defendant argues the adjustment is speculative and that Plaintiff's overall approach is flawed in the context of a property value appeal because it generates an investment value as opposed to market value conclusion. The court disagrees with both assertions.

■    Considering first the assertion that rent loss is too speculative, Defendant agrees to the likelihood of a two-year lease-up period. Thus, lost rent is anticipated. *Ernst Brothers* dealt with the *possibility* of a mill closure or workforce reduction and its potential impact on the value of the town of Gilchrist, which was bought in a package deal that included 100,000 acres of timberland, a short-line railroad and a sawmill. 320 Or at 297. In *Ernst Brothers*, the court found that the appraiser for the Department of Revenue "failed to take that risk into account when he conducted his income analysis." *Id.* at 300. The mill had not closed and no reduction in the workforce had been announced. It was the dwindling supply of timber that suggested future changes were likely. The court found that:

"[t]he threat of a mill closure or a work-force reduction constituted a substantial risk with regard to the value of

Gilchrist in 1991. We thus agree with the Tax Court that 'an investor purchasing the property as of July 1, 1991, would certainly consider the risk that the mill would close when the current timber supply is exhausted.' The department's appraiser failed to take that risk into account when he conducted his income analysis."

*Id.* at 299-300 (citation omitted).

A similar situation exists in the present case in that the subject property was vacant for several years beginning in late 1996. The county's appraiser failed to take into account the market's response to that situation, including the likelihood of considerable lost rent. The county's asserted values therefore fail to appropriately account for the risk associated with the subject property. The court acknowledges that there is a degree of speculation involved in allowing a deduction for rent loss because the possibility exists that an owner/occupier might purchase the property and in that case there would be no loss. The weight of the evidence, however, suggests otherwise.

■ As for the second point, the court does not believe that by subtracting rent loss Plaintiff's appraisers are establishing investment value, but it is easy to understand why Defendant might draw that conclusion. Investment value is defined as *"the value of an investment to a particular investor based on his or her investment requirements.* In contrast to market value, investment value is value to an individual, not necessarily value in the marketplace." *The Appraisal of Real Estate* at 26. The statutory definition of real market value, which corresponds to the generally accepted definition in appraisal circles, is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[8]

Plaintiff's appraisers looked to the market in drawing their conclusions and in their reports used a definition of market value that is consistent with the statute. Their

[8] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to 1997. The court notes that the statutory definition was slightly different for the 1996-97 tax year. That difference is addressed later in the Decision.

assignment was to estimate market value. Neither was asked to value the property under particular investor requirements. Therefore, the court concludes Plaintiff's method does not result in an investment value estimate.

*Tenant Improvements*

The deduction for tenant improvements presents a more difficult question. As indicated above, Liebow subtracted roughly $900,000 based on a projection that the hypothetical purchaser/owner would have to pay $25 per square foot in order to attract tenants to a long-term lease. Jacobson, on the other hand, made no specific adjustment for tenant improvements but did subtract $100,000 in demising costs (the cost of dividing the building into two spaces). In fact, after considering the question of tenant improvements, Jacobson consciously determined no adjustment was appropriate. After lengthy and thoughtful consideration, the court reaches that same conclusion.

To begin with, only four of Liebow's seven lease comparables had tenant improvements and in one of those the lessee bore the cost. Moreover, three of the four leased spaces in Liebow's report that had tenant improvements were located in considerably older structures and two spaces were in the same shopping center, built in 1966. Additionally, two of the four leases were executed well after the assessment date for the latest of the four tax years at issue and do not necessarily reflect market perceptions in 1997 and 1998. Jacobson's 1997 appraisal, on the other hand, reported tenant improvements in only three of his eight leased properties and the rents at that time were higher ($8 per foot versus $7) although the tenant improvements were considerably lower ($7 per foot or less versus $27). As a result, Jacobson concluded a tenant improvement adjustment was not appropriate. The court is not persuaded by Jacobson's concession at trial that it was not unreasonable to subtract tenant improvements.

Jacobson subtracted roughly $600,000 for "entrepreneurial incentive" (risk) and Liebow made no such adjustment. Furthermore, Jacobson subtracted $100,000 for "building renovation" to account for the need to divide the building into two spaces. Subtracting those amounts from Liebow's

$913,203 tenant improvement adjustment brings the two appraisers within roughly $200,000. Any further reduction for tenant improvements might be offset by higher market rents demanded by a lessor agreeing to pay for significant tenant improvements. Typically landlord-borne tenant improvements are recovered in the form of higher rent. *See, e.g., The Appraisal of Real Estate* at 478. That was reflected in the Staples offer to rent half the building in early 1997 for $10 per square foot annually provided the owners paid $20 per square foot for tenant improvements. The effective rent was roughly $7 per foot, which is consistent with the market values presented by both sides.

The court also notes that there were three failed purchase offers of $2.65, $2.75, and $2.85 million between April 1999 and April 2000. The court understands that those offers were all contingent upon finding a tenant and that they came after the last of the four assessment dates at issue, but the offers are rather consistent with Jacobson's 1997 estimate and twice Liebow's $1.3 million estimate for 1999. The contingencies in those offers were all aimed at avoiding lost rent but do not appear to factor in $1 million in tenant improvements. That suggests the buyers either did not anticipate tenant improvements (at least not significant improvements) or that they perceived a stabilized value to be closer to $4 million. From this the court concludes that the likelihood of the market anticipating those costs is too speculative to warrant an adjustment.

*Value Reconciliation*

The burden of proof in a Tax Court proceeding is a preponderance of the evidence and rests initially upon the party seeking relief. ORS 305.427. "[T]he burden of going forward with the evidence shall shift as in other civil litigation." *Id*. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Thus, in the final analysis, the better case wins.

Plaintiff has sufficiently demonstrated that the roll values are in error. The requested values, however, go too far. Although the court does not believe Liebow estimated investment versus market value, it does find that his approach

places undue weight on the buyer's side of the equation and assumes a somewhat worse-case scenario. Defendant argues that the task is to value land and buildings ("bricks and sticks") and that Plaintiff's adjustments are based on speculation. The court agrees in part. The value of the building lies in its ability to generate income. For reasons not entirely clear to the court (or the owners), this property is difficult to lease-up. A subtraction for lost rent has therefore been allowed. No adjustment for tenant improvements was allowed because such an expense was too speculative.

The court has already determined that the evidence sufficiently demonstrates the risk attached to this property as it sat vacant. However, Liebow's value of roughly $1.3 million results in a building value of about only $300,000,[9] which works out to $6.50 per square foot for a three-year-old building[10] that has a 30-year life expectancy and cost $50 per square foot to construct. Liebow estimates the depreciated replacement cost new of the building to be $2.39 million. The disparity between these numbers is striking.

Plaintiff's two appraisers arrived at different "as-is" values for several reasons. It is sufficient to note that the appraisers began with different stabilized values and that Liebow subtracted roughly $427,000 more than did Jacobson. However, given the apparent changing market conditions and the stigma that came to attach to the property as it sat vacant, the differences are understandable. Defendant's values overlook the risk.

The court finds that the overall evidence supports Jacobson's value estimate of $2,390,000 for the 1997-98 tax year.[11] The best evidence of value for tax years 1998-99 and 1999-2000 is Liebow's estimates without the subtraction for tenant improvements. Accordingly, the court finds the values

---

[9] The parties substantially agree on a land value of $1 million.

[10] The building was three years old in late 1997, which is roughly the mid-point for the tax years at issue, having assessment dates of July 1, 1996 through January 1, 1999.

[11] As a check on that value, the court used Liebow's market rent of $7 per square foot, adjusting 5 percent each end for a vacancy and expenses, and increasing the capitalization rate from 10 percent to 12 percent to reflect the increased risk and arrived at an indicated value of $2,430,000 (rounded).

were $2,263,000 as of January 1, 1998 (1998-99) and $2,213,000, as of January 1, 1999 (1999-2000).

As for the 1996-97 tax year, the statutory definition of real market value was different that year because of legislative enactments adopted to implement Ballot Measure 5. Real market value was defined as "the minimum amount in cash which could reasonably be expected * * * in an arm's-length transaction during the fiscal year." ORS 308.205(1) (1995). The 1995 version of the law imposed a "retrospective" method of tax assessment which the Oregon Supreme Court noted "gives taxpayers the benefit of an assessed value for the tax year as of the day during the tax year on which the value was the lowest." *Shatzer v. Dept. of Rev.*, 325 Or 211, 216, 934 P2d 1119 (1997).[12] That point came at the end of the tax year, after Ernst vacated and the building had sat empty for roughly nine months. The court finds the value for tax year 1996-97 was the same as it was for tax year 1997-98— $2,390,000.

The adjustment to value allowed in this case should not be construed as establishing a rule that the absence of a tenant in all cases warrants an additional deduction in value. Typically tenant vacancies are addressed by making a percentage deduction from potential gross income. This case involved several unique circumstances, not the least of which is the fact that the property is a single or two-tenant building in an oversupplied market. As such the risks of ownership increase. *See, e.g.,* Steven Mooney, PhD, Timothy L. Vergin, MAI, and Stuart J. Mortrude, MAI, *Why Capitalization Rates of Single-Tenant Properties Vary*, The Appraisal Journal 366 (October 1998).

## CONCLUSION

After carefully considering the evidence, the court concludes the value of the subject property was $2,390,000

---

[12] Article XI, section 11b(2)(a), of the Oregon Constitution provides:

" 'Real market value' is the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion, from an informed buyer acting without compulsion, in an 'arms-length' transaction during the period for which the property is taxed."

for tax years 1996-97 and 1997-98; $2,263,000 for tax year 1998-99; and $2,213,000 for tax year 1999-2000.

IT IS THE DECISION OF THE COURT that the responsible county taxing authorities shall adjust the assessment and tax rolls to reflect the values set forth above and refund any excess taxes paid with statutory interest pursuant to ORS 311.806 and ORS 311.812.