IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

WILSONVILLE JUST STORE IT L.L.C., )
)
       Plaintiff, ) TC-MD 120417D
)
  v. )
)
CLACKAMAS COUNTY ASSESSOR, )
)
       Defendant. ) **DECISION**

Plaintiff appeals the 2011-12 real market value and exception real market value

determined by the Clackamas County Board of Property Tax Appeals (BOPTA) in its Order

dated April 11, 2012, for property identified as Account 00812099 (subject property).  Kevin

Howard (Howard), owner and broker of Kevin Howard Real Estate, Inc., and owner and

manager of 73 storage facilities, including the subject property, appeared and testified on behalf

of Plaintiff.  Ronald Saunders (Saunders), Oregon registered appraiser, appeared and testified on

behalf of Defendant.

Plaintiff's Exhibits 1 through 14, Conclusion (Tab 10), Addendum (Tab 11), Plaintiff's

Rebuttal Exhibit 15 and Defendant's Exhibit A were received without objection.

Both parties agree that the subject property's highest and best use as vacant is

commercial and as improved is the subject property's continued use as a self-storage facility.

The parties disagree that the facility will be expanded as requested in the original development

plan submitted to the City of Wilsonville.

I.  STATEMENT OF FACTS

The subject property is a "[t]hree story, heated self-storage facility (Phase 1) containing

404 self-storage units.  There [are] 55,900 [square feet] of gross building area, including the

leasing office, hallways, apartment and common areas.  There [are] 39,655 [square feet] of net rentable area." (Def's Ex A at 42.)  Saunders testified that the subject property is the newest of "the four self-storage facilities" in the city of Wilsonville and is "of superior design."  The subject property is located on 1.28 acres and was completed in May 2010.  (*Id*. at 16.)

Howard testified that Saunders incorrectly stated that there are"0.65 acres (28,507 [square feet]) of excess land planned for 404 self-storage units in a future second phase."  (*Id*.)  Howard testified that 6,000 square feet of the 28,507 square feet was required by the City of Wilsonville to be paved for 10 parking spots.  He offered a letter from Stu Peterson, SIOR, of Macadam Forbes, recommending that Plaintiff list the remaining vacant land (22,507 square feet)[1] for $4.50 per square foot "and expect to see offers starting in the low 3's per [square foot] for this land.  It has no frontage, bottleneck access and is of an irregular shape." (Ptf's Ex 14.)  Howard testified that the land parcel would require "an access easement, it is not on the main street" and "is blocked by the parking."  He testified that there are no comparable sales for this type of parcel.  Howard determined a real market value of $157,549 for the 22,507 square foot land parcel.  Saunders determined an "estimated value of the 28,507 SF of surplus land is $12.30 SF or $350,636.  To this amount is added an additional $50,000 for the entitlements and infrastructure which is in place, for a total estimated value of the surplus land of $400,636." (Def's Ex A at 70.)  Howard questioned Saunders, asking how he concluded the value was $400,636 when he previously concluded the value was $250,000 at the time he submitted his report to BOPTA.  (*cf*. Ptf's Rebuttal Ex 15 at 5.)  Saunders testified that for his current appraisal report he concluded that the land was "surplus, not excess, land" and Plaintiff originally "paid $15 per square foot" for land that Plaintiff is now "holding for future development, Phase II."  In

_____

[1] Peterson lists the area of the vacant land as 22,800 square feet.

response to Howard's questions, Saunders wavered, stating that it may not have been appropriate to include an "additional $50,000 for the entitlements and infrastructure." (Def's Ex A at 70.) Howard testified that the original plan was to attach an expansion, *i.e.*, Phase II, to Phase I, but that now with the 10 parking spaces, "Phase II could not be attached." Saunders stated that "there is no evidence" that the "surplus land is 20 percent or 30 percent of what Plaintiff originally paid for it."

Howard testified that he concluded the income approach was the only applicable method to determine the subject property's real market value because the subject property "is an income-producing property." Howard reviewed each of the components of the income approach, beginning with rental rates. He testified that there are "three properties within one-half mile of the subject" that support his rent comparables. Howard testified that at the time the subject property opened in May 2010, there was "pent up demand" and approximately 30 percent of the facility "quickly filled," but to compete with three other storage facilities in Wilsonville the subject property offers discounts, including "30% off for 1 year" or "50% off first 3 months." (Ptf's Ex 1.) Howard reviewed a "Comparison Chart" for square feet occupied and units occupied, testifying that the "business is seasonal with occupancy the greatest in July, August, and September." (*See* Ptf's Ex 2.)

Howard testified that it "takes five years to fill up" a storage facility, supporting his testimony with comparison charts for Tualatin Storage (built 2006) for January 2008 through June 2012, 88th Street Storage (built 2006) for February 2008 through December 2011, and Gresham Storage (built 2009) for June 2009 through June 2012. (Ptf's Exs 3-5.) Howard testified that "after five years the occupancy averages 79 percent, based on square footage." (*Cf.* Ptf's Ex 6.)

Howard testified that "operating expense percent as of June 2011" averaged 40.5 percent based on 64 storage facilities. (Ptf's Ex 8.)

Howard testified that a nine percent capitalization rate was appropriate for the subject property. He stated that there are few sales of storage facilities, making it "hard to determine a capitalization rate." He testified that in July 2011, he "purchased a storage facility located in Roseburg," paying $1,000,000 and resulting in an 8.5 percent capitalization rate. (Ptf's Ex 9.) He provided a broker's listing for Beaverton Safeguard Storage, showing a listing price of $1,850,000, and a "current cap rate" of 9.10 percent. (Ptf's Ex 10.) Howard testified that the "actual sale" occurred on April 5, 2011, and the buyer paid $1,825,000 for a "9.2 cap rate." (*Id*.)

Howard testified that he determined the subject property's real market value to be $1,685,520 as of January 1, 2011. (Ptf's Ex 7.) Howard explained that he determined an annual potential gross rental income of $404,594 based on the current mix of unit size and rental rates. (*Id*.) He testified that he concluded a "realistic" maximum occupancy of 79 percent of available square footage, resulting in rental income of $319,630 per year. (*Id*.) In response to Saunders' question, Howard disputed the statement made by one of his equity partners to the City of Wilsonville Development Commission that "two percent" is a "correct" vacancy rate." He testified that as of January 1, 2011, the subject property was "30 percent occupied" based on the number of units rented. Howard testified that he reduced the rental income by actual or estimated "rent up" cost and two percent "credit loss." (*Id*.) He testified that he determined "annual operating cost" to be 40.5 percent of "total sales." (*Id*.) In response to Saunders question, Howard testified that "property taxes are 12 percent of the total operating costs." Howard stated that even though he did not increase the annual income he did increase the "operating expenses each year, approximately $5,000 per year."

Howard testified that he capitalized the resulting annual net operating income for calendar years 2010 through 2016, concluding a real market "stabilized" value of $2,088,189 in 2016. (*Id*.) He testified that he subtracted the "present value of absorption" from the "fully leased up value" to arrive at a "net value" as of the assessment date of $1,685,520. (*Id*.) Saunders questioned Howard about his choice of a reversionary capitalization rate and how he computed the present value of the subject property as of the assessment date. Howard strongly advocated that an investor would not pay a "stabilized value sales price" for a "partially occupied building" and there would "likely be some deduction for absorption lease-up." Saunders stated that Howard's "DCF [discounted cash flow] is too speculative."

Saunders testified that his appraisal report considers the three approaches to valuation, cost, income and comparable sales. (Def's Ex A at 4.) Looking first at the cost approach, Saunders determined a land cost based on "the prior sale of the subject property," which "required a downward adjustment of 18% for time indicating a unit price of" $12.30 per square foot for an "indicated site value" of $685,811. (*Id*. at 66, 70.) Even though Saunders determined the "value of surplus land" to be $350,636, he did not include that value in the "Value Indicated by the Cost Approach." (*Id*. at 74.) Saunders stated in his appraisal report that he "utilized Marshall Valuation Service" in determining the "replacement cost includ[ing] estimates of direct costs, indirect costs and developer's profit." (*Id*. at 71.) Howard challenged Saunders's inclusion of "Absorption/Lease-up Cost" in the amount of $500,000, which Saunders stated was "[b]ased on county appraiser's estimate." (*Id*. at 73.) Saunders determined a depreciated replacement cost including the site value without the surplus land of $4,174,657. (*Id*. at 74.) Howard testified that in September 2010, the subject property was subject to a loan

/ / /

in the amount of $3,100,000. He testified that "there was no indication at the time [the subject property's improvements were] being built that the economy would be in this state."

Saunders's appraisal report described the sales comparison approach:

"The comparables in this section represent the best comparable data [in the Portland-Vancouver Metropolitan Statistical Area] the appraiser could verify as of the effective date of the appraisal. The appraiser reviewed ten comparable sales of which the six most comparable sales were selected. * * *.

"* * * * *

"The appraiser made qualitative adjustments which are shown in the sales adjustment grid later in this section. The adjustments are based upon conversations with market participants tempered with the appraiser's experience.

"* * * The appraiser will utilize a negative 6% annual time adjustment (after January 1, 2009) to adjust the sale prices to the January 1, 2011 date of value and a positive 6% annual time adjustment for sales which occurred after January 1, 2011 date of value. * * *.

"* * * * *

"* * * Overall, no one sale had predominant comparability. * * * Considering the subject's potential stabilized [net operating income] per [square foot], location, new condition and occupancy stabilization costs, it is the appraiser's opinion that the subject property would sell for approximately $85.00 [per square foot] in comparison. When the subject's 39,665 [square foot net rentable area] is multiplied by $85.00 the indicated value is $3,370, 675. To this amount is added the value of the subject's phase 2 surplus land which was previously estimated to be $400,636 for a total value of $3,771,311."

(Def's Ex A at 86, 92.) Saunders also discussed the "Income Multiplier Analysis." (*Id*. at 93.)

Saunders concluded:

"The range [7.22 to 8.66] of EGIM [effective gross income multiplier] is a much more narrow[] range[,] reflecting the actual occupancy level of each comparable sale. It will be used to estimate the value of the subject property. The subject being new in a developing area with upside potential should have a multiplier in the upper end of the range. * * * Considering the subject's location, condition, age, quality and design, it is my opinion that the subject property would sell for an EGIM of 8.25 in comparison.

/ / /

/ / /

> "* * * [T]he indicated market value is $3,210,273. To this amount is added the value of the excess land of $400,636 for a market value estimate of $3,610,909.
>
> "* * * * *
>
> "The price per SF indicated a value estimate of $3,771,311. The effective gross income multiplier indicated a value conclusion of $3,610,909. Equal weight was placed on both indications of value. The sales data provide reasonable support for a market value estimate as of January 1, 2011 of $3,700,000."

(*Id*. at 93.) Howard questioned Saunders about the three comparable sales occurring in January 2008, April 2008 and May 2008.

Saunders's appraisal report discussed the income approach, stating that "[t]he rent comparables selected are located within a four mile radius of the subject property." (*Id*. at 75.) Howard testified that two of Saunders's rent comparables are more than "12 miles" from the city of Wilsonville. He asked how those can be comparable to the subject property, specifically when those two facilities are "highly occupied" and "rents are higher" than at the subject property. After reviewing the comparable rent data, Saunders found that the "subject's actual rental rates are below the rental range indicated by the rent comparables. The subject consists of several unit sizes * * * that are not 'typical' market unit sizes; however, a majority of the subject units are close to these typical sizes * * *." Saunders stated that "[c]onsidering the current recession, a typical purchaser would place most weight on the subject's actual achieved rents" and found that total annual rental income was equal to actual rents, or $426,630. (*Id*. at 82.) Saunders determined that the subject property

> "receives other income from late fees and merchandise sales such as boxes, locks, labels, etc. A[n] estimate of $500 per month or $6,000 per year is projected for this category. * * * The potential gross income is the sum of the gross annual rental income of $426,360 and the additional annual income of $6,000 for a total estimated amount of $432,360 per year."

(*Id*. at 83.)

Relying on the "subject developer" who "reported that there was a 2.2% vacancy rate over the last ten years in his land use application to the city of Wilsonville in 2009," Saunders concluded that "the average total vacancy and credit loss estimate for investment property is * * * 10% of potential gross annual income on a long term basis." (*Id.*) Howard challenged Saunders's conclusion, stating that Saunders's data supported a vacancy percentage of 9.53 percent and that Saunders did not include anything for credit loss. (*Id.* at 60.) Howard testified that the actual amount for vacancy should be 14 percent, discount two percent and credit loss five percent for total of 21 percent.

Saunders's appraisal report stated that the "comparable sales * * * indicated expense percentages of 34 – 37% of effective gross income. Considering the fact that the subject property is a new functional, average quality facility in good condition, stabilized operating expenses of 35% have been estimated." (*Id.* at 83.) Howard questioned Saunders as to why he included property taxes in the operating expenses even though those expenses should have been removed and a property tax rate added to the capitalization rate. Howard admitted that he too included property taxes in his determined operating expense rate.

Saunders concluded that the

"comparable sales indicated a range of overall [capitalization] rates from 7.5% to 9%. * * * Considering the subject [is] newer, well located, surrounded by developing residential, commercial and industrial areas, in an area with a historically low vacancy rate, an appropriate overall rate for the subject property is judged to be 8% in comparison. When the estimated annual [net operating income] of $252,931 is divided by an overall rate of 8%, the indicated value is $3,161,638."

(*Id.* at 84.) To that indicated value, Saunders added the "market value of the surplus land [$400,636]" to determine an "estimated market value of the subject property as of January 1, 2011" to be $3,562,274. (*Id.*) Howard challenged Saunders's capitalization rate, stating that he failed to "adjust for the crash in the market."

In reconciling the three approaches to valuation, Saunders's appraisal report stated:

> "After considering factors relevant to the valuation of the subject property and the quality of available data for analysis, most weight was placed on the value indication from the income approach, which indicated a market value of the fee simple interest in the real property as of January 1, 2011 of $3,562,274. Additional support was provided by the value indicated by the sales comparison approach. This approach supports the reasonableness of the value indication provided by the income approach. Limited weight was placed on the cost approach which is believed to set the upper limit of value * * *."

(*Id.* at 95.) Howard stated that even though Saunders considered all three approaches Saunders concluded that "the income approach was the strongest indicator of value."

## II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2011. In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[2] ORS 308.205(1) defines real market value as follows:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Real market value is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979). Saunders considered all three approaches to valuation,

---

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2009.

concluding that the subject property's real market value is best determined by the income approach. Plaintiff relied on a modified income approach. The court agrees that because the subject property is an income producing property, the income approach is the most reliable.

"Any property that generates income can be valued using the income capitalization approach." Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2008). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. at 445. Anticipation is defined as "[t]he perception that value is created by the expectation of benefits to be derived in the future." *Id*. at 35.

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* at 253. Looking first at the capitalization rate, Plaintiff concludes that the appropriate rate is nine percent after considering sales occurring after the assessment date and the financial market conditions as of the assessment date. Defendant concludes that the appropriate rate is eight percent, giving most weight to the subject property's age and location. Defendant's comparable sales support Plaintiff's conclusion that the capitalization rate should reflect the change in the market resulting from the lack of liquidity after the financial crisis of late 2008. (*See* Def's Ex A at 87 (showing nine percent capitalization rate in all three post-2008 sales).) Based on the evidence, the court agrees with Plaintiff that the capitalization rate should be 9 percent. Even though the subject property is new, it faces competition from three competitors, all within a few miles and offering the same service: storage.

This court has stated that a property tax rate should be added to the capitalization rate. Neither party included a property tax rate in their capitalization rate. Saunders provided information that the property tax rate as of the assessment date was $18.7129 per thousand. (Def's Ex A at 33.) Plaintiff submitted the Clackamas County Board of Property Tax Appeals 2011-2012 Value Recalculation stating that the changed property ratio is 0.886. (Ptf's Rebuttal Ex 15 at 46.) After applying the "changed property ratio" to the property tax rate the adjusted property tax rate is 1.66 percent. The overall capitalization rate is therefore 10.66 percent.

The next key component is net operating income. The starting point in determining net operating income is potential gross revenue. In determining potential gross revenue, Saunders completed a rent comparable study. (Def's Ex A at 75-82.) Howard concluded that for the next five years the subject property would not increase the 2010 rental rates. The court agrees with Saunders that to compute the subject property's real market value at the point it reaches stabilization market rents are appropriate. The court accepts Defendant's potential gross income of $432,000 (rounded) per year. (*Id*. at 83.)

The parties differ significantly as to the appropriate vacancy and collection loss. Saunders placed significance on the "subject developer" who "reported that there was a 2.2% vacancy rate over the last ten years" in the "city of Wilsonville for the three [prior] existing self-storage properties." (*Id*.). He acknowledged that as of the assessment date the "subject was approximately 30% occupied," but did not consider how the introduction of 404 storage units in a relatively small market would impact vacancy rates for a new property. (*Id*.) Howard testified that to attract renters the subject property extended discounts in addition to vacancy and credit losses. Based on the evidence, the court concludes that the total vacancy, credit loss, and

/ / /

discount rate is 17 percent. As a result, the subject property's effective gross income is $359,000 (rounded).

To compute net operating income, effective gross income is reduced by annual operating expenses. The parties' estimates of operating expenses ranged from 35 percent to 86.4 percent. (Def's Ex A at 83; *see* Ptf's Exs 7-8.) Both parties included property tax expense in total estimated annual operating expenses. This court has previously concluded that the property tax expense should not be included in the operating expenses and that a property tax rate should be added to the capitalization rate. Based on the evidence, the court concludes that the operating expense percentage excluding the property tax expense is 30 percent.

After adjusting the effective gross income for operating expenses, the net operating income is $251,300. Using the overall capitalization rate of 10.66 percent, the subject property's real market value as of the assessment date is $2,360,000 (rounded.)

Plaintiff requests that the subject property's real market value be reduced by the "present value of absorption calculation" in the amount of $402,669. (Ptf's Ex 7.) In its discussion of absorption, this court looked to examples reported in the eleventh edition of *The Appraisal of Real Estate*:

> "One type of problem property is a property that has not achieved the level of utility for which it was designed and consequently is a financial failure, e.g., a strip shopping center that did not meet a breakeven occupancy level and thus has not generated the necessary cash flow to pay debt service or provide a return on the investment * * *."

*Kailes v. Josephine County Assessor*, 16 OTR-MD 348, 354-55 (2001) (quoting Appraisal Institute, *The Appraisal of Real Estate* 580 (11th ed 1996)). The court does not agree that the subject property is like the problem property example. As of the date of assessment, the subject property had been operating for approximately six months. Six months is insufficient time to conclude that the subject property is a "financial failure." (*Id.*) Howard testified that "[n]ew

complexes are taking 5 years to fruition. Initially they see a quick increase from 0 to 30%, then they plateau." (Ptf's Let dated Sept 6, 2012.) Howard testified that after 24 months the subject property is 67 percent occupied. (Ptf's Addendum, "Assessor's Survey – July 2012".) Based on that evidence and Howard's testimony, the subject property appears to be ahead of Howard's "5 years to fruition." The court concludes that for the tax year under appeal there is insufficient evidence that an absorption adjustment is necessary to determine the subject property's real market value as of the assessment date.

The parties agree that the real market value of a land parcel identified as surplus land must be added to the real market value determined by the income approach. The parties disagree as to the size of the surplus land. The court accepts Howard's testimony that the surplus land measures 22,507 square foot after a reduction for the 10 parking spaces overlooked by Defendant. Howard determined a real market value of $157,549, or $7.00 per square foot, even though he offered a letter from a real estate broker concluding that the parcel should not be listed for more than $4.50 per square foot. (Ptf's Ex 14.) Saunders determined a real market value of $350,636, based on 28,507 square feet valued at $12.30 per square foot. (Def's Ex A at 70.) Saunders placed the most weight on Plaintiff's purchase price of the entire parcel in July 2009, adjusted "downward" 18 percent "for time" for an indicated price per square foot of $12.30 (rounded.) (*Id*. at 66, 70.) Saunders's comparable land sales were for parcels substantially larger than the surplus land. (*Id*. at 60.)

After reviewing the testimony and evidence, the court concludes that there is insufficient evidence for the court to make a determination of the real market value of the surplus land. For the board of property tax appeals hearing, Saunders concluded a real market value of "$250,000

/ / /

for excess land (35% of the site value)." (Ptf's Rebuttal Ex 15 at 5.) Lacking sufficient evidence to the contrary, the court accepts that determination.

The subject property was placed on the tax rolls for the first time in the 2011-12 tax year. Neither party submitted evidence of real market exception value. Given the court's determination that the subject property's real market value is substantially the same as the real market value determined by the Clackamas County Board of Property Tax Appeals, the court accepts the "Real Market Value of Exception Found by Board" in the amount of $1,861,683. (Ptf's Compl at 4.)

### III.  CONCLUSION

After careful review of the testimony and evidence, the court concludes that the income approach is the best method to determine the subject property's real market value. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2011-12 real market value of property identified as Account 00812099 is $2,610,000.

IT IS FURTHER DECIDED that the 2011-12 real market exception value of property identified as Account 00812099 is $1,861,683.

Dated this ____ day of December 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on December 12, 2012. The Court filed and entered this document on December 12, 2012.*