IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CLP ELEMENTS LLC,                       )
                                        )
                Plaintiff,              )     TC-MD 110559N
                                        )
        v.                              )
                                        )
BENTON COUNTY ASSESSOR,                 )
                                        )
                Defendant.              )     **DECISION**

Plaintiff appeals the real market value of property identified as Account 417374 (subject

property) for the 2010-11 tax year.  A trial was held in the Oregon Tax Court Mediation Center

on November 14, 2011.  Richard Carone (Carone), general partner of Plaintiff, appeared and

testified on behalf of Plaintiff.  Steven Zenker (Zenker), Certified General Appraiser, MAI,

Cushman & Wakefield of Oregon, Inc.; Kinn Edwards (Edwards), proprietor and co-owner of

del Alma restaurant and bar; and Darren Dickerhoof (Dickerhoof), owner of several retail and

office properties in Corvallis, also testified on behalf of Plaintiff.  Richard D. Newkirk, Jr.,

(Newkirk), commercial and industrial appraiser, appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 9, 16, 17, 18, 19, 21, 22, 24, and 25 and Defendant's Exhibits A, B,

and C were offered and received without objection.

I.  STATEMENT OF FACTS

The subject property's 2010-11 roll real market value was $8,395,950 and its 2010-11

maximum assessed value was $5,365,491.  (Ptf's Compl at 2.)  "The subject property is a six-

story mixed-use building that includes three floors of 'spa' space, one floor is designated for

office use and the top two floors are improved for restaurant/bar use."  (Ptf's Ex 1 at v.)  The

subject property land is 4,792 square feet and the subject property improvement is 27,534 square

feet, gross[1]; the net rentable area of the subject property is 21,441 square feet. (*Id.*; Def's Ex A at 7.) Construction of the subject property improvement was completed in 2008. (Ptf's Ex 1 at v.) Zenker determined it to be of good quality and good condition. (*Id.*) The subject property does not include any parking. (Def's Ex A at 12.) Plaintiff has "a lease for parking on a paved parking area about ½ block south * * * of the subject property. The lease provides for 27 parking spaces at $50 each/month * * *. The parking rate is typical for the City of Corvallis downtown area." (*Id.*)

Zenker testified that the subject property is located on SW 2nd Street in downtown Corvallis. (*see* Ptf's Ex 1 at vii-ix.) He testified that corner lots are typically more valuable than center lots, like the subject property, because corner lots receive more exposure. Zenker determined that the subject property is zoned central business. (Ptf's Ex 1 at v; *see also* Ptf's Ex 17 (Corvallis zoning map showing that the entirety of 1st Street is in the Riverfront zone whereas the majority of 2nd Street is in the Central Business zone).) He testified that he confirmed the subject property zoning with the City of Corvallis. Zenker noted that Newkirk identified the subject property zoning as "River Front," which allows some residential uses. (*See* Def's Ex A at 14.) Newkirk testified that the he talked with someone at the Corvallis city planning department and was told that one of the goals of the Riverfront zone is to increase population density in downtown Corvallis. Dickerhoof testified that he views the Riverfront zone as a drawback because it is not clear what is allowed; a lot of discretion is left to the City of Corvallis and it is burdensome to determine allowable uses.

Both parties provided appraisal reports. Carone testified that he retained Zenker on the recommendation of Citizens Bank; he had no prior relationship with Zenker, which Zenker

---

[1] Defendant lists the subject property as 27,147 square feet, gross. (Def's Ex A at 7.)

confirmed in his testimony. Zenker testified that he had previously appraised the subject property for Citizens Bank for lending purposes. He testified that he has been in the appraisal business since 1986 and appraised over 100 buildings in the last five years. Zenker testified that his appraisal of the subject property complies with the Uniform Standards of Professional Appraisal Practices (USPAP). He testified that he determined the value of the subject property as though stabilized and then subtracted lease-up costs. Zenker determined the value of the subject property as of both January 1, 2009, and January 1, 2010. (Ptf's Ex 1 at vi.) Newkirk testified that his appraisal report is an updated version of the report that he prepared for the previous tax year appeal involving the subject property.

A.    *Highest and best use*

Zenker determined the subject property's highest and best use as improved to be "[l]eave the first floors in their current configuration but convert the upper floors (fifth and sixth floors) to office use[.]" (Ptf's Ex 1 at v.) Newkirk determined the highest and best use of the subject property as improved to be the "current use - mixed use office/retail building," with an alternative highest and best use of "office use, or mixed use - office/retail." (Def's Ex A at 14.)

B.    *Plaintiff's income approach*

As of January 1, 2010, the fifth and sixth floors of the subject property were completely vacant and the fourth floor had only six percent occupancy; the subject property occupancy was 54.2 percent.[2] (Ptf's Ex 1 at 71, 84.) A tenant rented 240 square feet on the fourth floor at $1.25 per square foot on a modified gross month-to-month lease; Plaintiff "anticipates that [the] tenant will move as more space is leased in the building." (*Id.* at 72-73.) As of January 1, 2010, Epic Spa rented the first three floors at $2.30 per square foot, triple net. (*Id.*) Carone testified that he

_____

[2] As of January 1, 2009, the subject property occupancy was 81.2 percent (17,413 square feet). (Ptf's Ex 1 at 70, 83.)

is a part-owner and the landlord of Epic Spa. He testified that, in 2011, the spa will likely "break even" at just under $1 million in revenue, which is up 20 percent from the 2010 spa revenue of about $800,000. Carone testified that the spa lease is $13.64 per square foot, annually.

Zenker determined that, in the subject property's market, "office leases for this property type are typically written on a modified (full service gross) basis whereby the tenant is required to pay for any increases (pro rata share) in base-year expenses. Retail spaces in the market are typically structured on a net (triple net) basis in which the tenant pays their pro rata share of expenses." (Ptf's Ex 1 at 71.) Zenker's rent conclusions for all floors of the subject property are all based on modified gross leases. (*Id.* at 76.)

Zenker determined market rent for the fourth, fifth, and sixth floors of the subject property based on office rent comparables. (Ptf's Ex 1 at 74-77.) Although the subject property fifth and sixth floors were, in fact, operated as a restaurant, Zenker "estimate[d] rent for the upper floors assuming office use" as of January 1, 2010. (*Id.* at 77.) He identified six office rent comparables with per month rents ranging from $1.60 to $2.25 per square foot and an average of $1.98 per square foot. (Ptf's Ex 1 at 74, 76.) Zenker's office rent comparables are all older than the subject property and all are "Class B" whereas the subject property is "Class A." (*Id.*) He reported that Gary Pond of Commercial Associates "noted that the subject [property] is probably one of the few if only 'Class A' office propert[ies] in Corvallis." (*Id.* at 76.) Zenker stated that Pond believed the subject property "should be able to command rents in the $2.25 to $2.50 per square foot per month range." (*Id.*) Zenker concluded rent of $2.25 per square foot for the subject property fourth floor and $2.30 per square foot for the subject property fifth and sixth floors. (*Id.*)

Zenker determined market rent for the first, second, and third floors of the subject property based on spa and retail rent comparables. (Ptf's Ex 1 at 78-80.) He identified six "retail rent comparables" for the subject property with rents ranging from $1.20 to $2.10 per square foot and an average of $1.67 per square foot. (*Id.* at 78, 80.) The subject property "is considered to be superior to all of the comparables in terms of quality." (*Id.* at 80.) Zenker testified that comparable 7, Retreat Day Spa, is the best comparable for subject property spa space; 2010 rent was $2.10 per square foot. (*See id.* at 78, 80.) He reported that there are ten spas located in the Corvallis area, the largest of which is the Retreat Day Spa. (*Id.*) "[T]he brokers who sold the subject [property] indicated that there were three operators in the Portland area that were willing to lease the subject [property]'s spa if it were available. No lease information was provided for these potential tenants." (*Id.*) Zenker noted that a spa "located in the Pearl District of downtown Portland," the "Salt Grotto," leases space at "$2.00 per square foot on a net basis [and t]he lease began in August of 2009." (*Id.*) That spa "reportedly completed [its] own interior improvements at a cost in excess of $50.00 per square foot." (*Id.*) Zenker determined "that an appropriate rent for the subject [property spa space] should be from $2.00 to $2.50 per square foot per month" and determined rent as of January 1, 2010, to be $2.30 for the first floor and $2.05 for the second and third floors. (*Id.* at 80-81.) Zenker explained that the first floor has better exposure and access than the second and third floors. (*Id.* at 80.)

Dickerhoof testified that he owns and manages numerous retail and office properties in Corvallis, including two shopping centers. He testified that he leases office space at about $1.50 to $1.60 per square foot on a full service lease. Dickerhoof testified that his retail properties lease at rates ranging from $1.00 per square foot to $2.15 per square foot, triple net. Newkirk

/ / /

asked Dickerhoof if one could get $2.00 per square foot for the subject property. Dickerhoof testified that he approached "image conscious" tenants and could not get any "bites."

Using the net rentable area, Zenker determined total gross income of $566,660 for the subject property. (Ptf's Ex 1 at 82.) He determined a five percent vacancy and collection loss to be the "stabilized" rate as of January 1, 2010, and subtracted $28,333 for effective gross income of $538,327. (*Id.* at 83, 91.) Zenker considered the subject property actual expenses and operating expenses of other, similar properties. He calculated expenses for subject property including property insurance, management fees, total utilities, repairs and maintenance, cleaning and janitorial, parking lot payments, and other taxes, fees, and permits (not including property taxes). (Ptf's Ex 1 at 87.) Zenker determined the total operating expenses for the subject property to be $173,850, which is $8.11 per square foot or 32.29 percent, as of January 1, 2010.[3] (*Id.*) He also identified three expense comparables in Corvallis, each of which is listed as "confidential" and not named; total expenses for net rentable area ranged from $7.20 to $7.82 per square foot for those properties. (*Id.* at 89.) Zenker testified that he used the subject property actual expenses and concluded total expenses of 36.88 percent including property taxes.[4] (*Id.* at 91.) Zenker determined net operating income (NOI) of $339,817[5] as of January 1, 2010. (*Id.*)

To determine an appropriate capitalization rate for the subject property, Zenker considered market conditions, office market investor surveys, and comparable sales of office

---

[3] Those figures appear to be typographical errors. The expenses listed by Zenker add up to $130,970 and $6.11 per square foot, or 24.33 percent of effective gross income, which is Zenker's conclusion for January 1, 2009. (Ptf's Ex 1 at 90.) Zenker's January 1, 2010, net operating income (NOI) of $339,817, including property taxes, appears to be calculated based on operating expenses of $130,970; if operating expenses of $173,850 were used, the January 1, 2010, NOI would be $296,937, not $339,817, as he concluded. (*See id.* at 91.)

[4] If the typographical error in Zenker's calculation of operating expenses as of January 1, 2010, were corrected, total operating expenses would be $6.11 per square foot, or 24.33 percent, as concluded in 2009; total expenses would remain 36.88 percent as stated in Zenker's report. (*See* Ptf's Ex 1 at 90-91.)

[5] Not including property taxes, Zenker's NOI as of January 1, 2010, is $407,357. (*See* Ptf's Ex 1 at 91.)

properties. (Ptf's Ex 1 at 91-95, 98-103.) Zenker identified three comparable sales in 2009 with capitalization rates ranging from 8.14 percent to 8.40 percent. (*Id.* at 100.) The Korpacz fourth quarter 2009 investor surveys reported an average capitalization rate of 8.75 percent for the national office market and 9.30 percent for the Pacific Northwest market. (*Id.* at 101.) Zenker concluded a capitalization rate of 9.25 percent as of January 1, 2010. (*Id.* at 103.) Newkirk questioned Zenker's use of a 9.25 percent capitalization rate when the highest rate indicated by Zenker's actual sales was 8.40 percent. Zenker testified that the subject property presents more risk to a potential investor because it is a mixed use property. Dickerhoof testified that capitalization rates range from 6.5 percent for long-term leases with national tenants such as Auto Zone, to 8.5 or 9 percent for multi-tenant properties. He testified that those rates reflect risk, and long-term leases with large, national companies are less risky. Zenker determined a "Hypothetical Stabilized Value" of $3,673,697 as of January 1, 2010. (*Id.*)

Zenker determined that lease up costs should be subtracted from value conclusions under the cost, sales comparison, and income capitalization approaches. He stated that "leasing activity in the market appears to be stagnant for the moment." (*Id.* at 84.) Zenker determined an 18-month lease up period to be reasonable as of January 1, 2010.[6] (Ptf's Ex 1 at 84.) Using "stabilized" vacancy of five percent, he concluded that 89.1 percent of the 9,824 square feet of vacant space as of January 1, 2010, must be occupied before the subject property reaches stabilized occupancy. (*Id.* at 85.) Using a blended rental rate of $2.28 per square foot, tenant improvements of $25 per square foot, and 10 percent entrepreneurial profit, Zenker calculated lease up costs of $701,772. (*Id.* at 86.) He subtracted lease up costs for an "Indicated 'As Is' Value" of $2,970,000 (rounded) for the subject property as of January 1, 2010. (*Id.* at 103.)

---

[6] Zenker determined a 12-month lease up period to be reasonable as of January 1, 2009. (Ptf's Ex 1 at 83.)

C.    *Defendant's income approach*

Newkirk testified that the subject property was not stabilized as of January 1, 2010. He stated that the "net rentable area" of the subject property averaged $36.32 per square foot. (Def's Ex A at 64.) Newkirk stated that "the Epic Spa lease [of the first three floors] contains provisions for the lesser of 15% of revenues, or $3.03 per square foot (monthly)." (*Id.*) He stated that Plaintiff's "rent receipts for 2010 were $111,019, representing receipts for Epic Spa based on 15% revenues, and partial year rental receipts from the Watershed, a new office tenant occupying the 4th floor." (*Id.*) The fifth and sixth floors of the subject property were vacant in 2010, but "2011 income also includes an interim tenant (The Vue), located on the 5th and 6th floors * * * [that] provides weddings and other events to the general public." (*Id.*) "[T]otal project income [is] estimated between $274,010 and $449,000 for 2011." (*Id.*)

Newkirk identified seven rent comparables (five leases and two listings) for the subject property office and spa spaces and three rent comparables for the subject property restaurant space. (*See* Def's Ex A at 63.) Newkirk testified that he considered medical offices as comparable to the subject property spa space because it was hard to find spa rent comparables. His office lease comparables are all properties built between 1999 and 2009 located in Corvallis and Salem. (*Id.* at 72.) The three properties in Salem are Class A and the four in Corvallis are Class B. (*Id.*) The five existing leases are dated in 2008, 2009, and 2010 and are all modified gross. (*Id.*) The unadjusted lease rates range from $1.74 to $2.36 per square foot per month; Newkirk's adjusted lease rates range from $2.31 to $2.92 per square foot per month. (*Id.*) The two lease listings are $1.90 and $2.45 per square foot per month, unadjusted; Newkirk adjusted those listings to $2.30 and $2.43 per square foot per month. (*Id.*) Based on those comparables, Newkirk selected a lease rate of $2.83 per square foot per month for the first three floors of the

subject property and $2.50 per square foot per month for the fourth floor of the subject property. (*Id.* at 64.)

Newkirk's three restaurant rent comparables are Tokyo Steakhouse, Baja Fresh, and Del Alma, which is managed by Edwards, all located in Corvallis.[7] (Def's Ex A at 74-77.) Respectively, the lease rates were $1.58, $2.50, and $1.58 per square foot per month, unadjusted, and $2.67, $3.58, and $1.58 per square foot per month, adjusted. (*Id.*) Newkirk determined reasonable restaurant rent to be $3.13 per square foot per month. (*Id.* at 82-83.)

Edwards testified that he is a proprietor and co-owner of Del Alma, Newkirk's restaurant comparable 3, and that he has been in the restaurant business since 1986. He testified that several Corvallis restaurants closed in the past few years. Edwards testified that a restaurant's rent should not constitute more than 10 percent of its revenue. He testified that, in 2011, Del Alma's rent was $8,000 per month based on a full service lease at $1.60 per square foot per month. Edwards testified that Del Alma's 2011 revenue as of the date of trial was $65,000 to $70,000 per month, but his goal is $80,000 per month revenue. He testified that typical monthly revenues for downtown Corvallis restaurants range from about $60,000 to a high of $100,000. Dickerhoof testified that Newkirk's comparable 2, Baja Fresh, is located on 9th street, which is a better location than the subject property because of increased traffic and exposure; it also has parking.

Newkirk also concluded vacancy and collection loss of five percent for the subject property. (Def's Ex A at 81-83.) To determine market expenses, Newkirk obtained "[f]ive (5) leases * * * from the Corvallis market * * *." (*Id.* at 80.) The "office" properties range in size from 2,910 square feet to 264,000 square feet. (*Id.*) Lease rates ranged from $1.38 to $1.88 per

---

[7] The Tokyo Steakhouse and Baja Fresh leases are both triple net; Del Alma lease is full service. (Def's Ex A at 77.)

square foot per month. (*Id.*) Newkirk calculated expense ratios for each of the five properties by dividing the "lease expenses" by the "annual lease" for rates ranging "from 25.12% to 35.27% of the gross lease rate, or about an average of 30.20%." (*Id.*) He concluded "an expense rate of about 25%" for the subject property office space. (*Id.*) For the subject property restaurant space, Newkirk stated that comparable leases are typically triple net and "[m]anagement fees typically range between 2 and 6 percent[,]" so he selected expenses of four percent. (*Id.* at 82.) Newkirk also included "structural reserves" at 2.5 percent in his calculation of NOI.[8] (*Id.* at 81-83.) Newkirk testified that his expenses included property taxes.

Newkirk analyzed market sales of "generally comparable property sold in Oregon within the past 48 months" to determine an appropriate capitalization rate for the subject property. (Def's Ex A at 79.) He selected six sales and two listings of "office [and] medical office propert[ies]" and five sales of "restaurant" properties. (*Id.*) Newkirk's six office and medical office sales occurred between November 2007 and August 2009; he found that "typical capitalization rates for medical/office properties range from 6.5% to 8.85%, with an average of 7.00% for listings, and 7.47% for improved sales." (*Id.*) He concluded a capitalization rate of 7.5 percent for "medical/office space in the subject property." (*Id.* at 80.) Newkirk's restaurant sales occurred between December 2005 and February 2010; he found that, "[f]or restaurant properties, capitalization rates range from 5.56% to 13.48% with an average of 7.76%."[9] (*Id.* 79-80.) Newkirk selected a rate of 6.75 percent for the "restaurant" space. (*Id.* at 80.)

Newkirk calculated NOI and an indicated value for each of the three types of spaces in the subject property. (Def's Ex A at 81-83.) In his report, he used gross square feet rather than

---

[8] Newkirk testified on cross examination that the "25%" expense ratio stated for the subject property restaurant space was a typographical error; the correct figure is four percent. (*See* Def's Ex A at 83.)

[9] 13.48 percent capitalization rate for the Junction City sale. (Def's Ex A at 79.)

net rentable square feet to calculate NOI and concluded a value of $8,660,000, then subtracted

the value of parking, $400,000, for an indicated value of $8,260,000 under the income approach.

(*Id.* at 83-84.) Newkirk testified on cross examination that he erroneously used gross square feet

rather than net rentable square feet and revised his calculation to reflect net rentable square feet;

he concluded a value of $6,450,000, after subtracting $400,000 for parking.

D.      *Sales comparison approach; subject property sale*

Zenker analyzed market sales based on "sales price per square foot of net rentable area."

(Ptf's Ex 1 at 57.) He identified five sales of comparable properties in Eugene in 2008 and 2009

and one listing in Corvallis. (*Id.* at 60.) The unadjusted prices per square foot for those six

properties ranged from $121.38 to $237.56, with an average of $156.44 per square foot. (*Id.*)

Zenker made qualitative, percentage adjustments and determined adjusted prices per square foot

ranging from $129.19 to $196.75, with an average of $154.82 per square foot. (*Id.* at 62.) He

testified that the subject property does not have its own parking spots whereas all of the

comparable sales and listing have parking, so he made a downward adjustment of five percent to

each sale and listing price. (*See id.*) Zenker also made a downward location adjustment of five

percent to each of the sales of Eugene properties. (*Id.*) He made upwards adjustments for "age,

quality, & condition." (*Id.*) Zenker made downward adjustments to the five Eugene sales for

market conditions. (*Id.*) He made a downward adjustment to the listing because it is a listing.

(*Id.* at 62, 64.) Zenker made a downward adjustment to each sale and listing because "the

subject [property's] mixed-use configuration would limit its marketability[.]" (*Id.* at 62, 65.)

Zenker determined that his comparable sales 2, 3, and 6 were the most similar to the

subject property based on the net adjustments; the adjusted prices per square foot of those sales

were $129.19, $168.16, and $136.12, respectively. (Ptf's Ex 1 at 68.) Zenker described his sales

2, 3, and 6 as "overall inferior" to the subject property. (*Id.* at 62.) His comparable sale 5, with an unadjusted sale price of $237.56 per square foot and an adjusted price per square foot of $196.75 was the only comparable sale that he considered "overall superior" to the subject property. (*Id.*) Zenker selected a price of $160 per square foot and determined an "Indicated Hypothetical Stabilized Value" of $3,430,560. (*Id.* at 68.) Subtracting lease up costs of $701,772, he determined a value of $2,730,000 under the sales comparison approach. (*Id.*) Zenker considered that value reasonable as compared with the subject property purchase price of $3,259,000 in June 2009, and "in light of changes in the economy * * *." (*Id.* at 69.)

Newkirk testified that his sales comparison approach was the same as that which he utilized for the 2009-10 appeal, with the exception of a new medical office sale 5. (*See also* Def's Ex A at 34.) Like Zenker, Newkirk's unit of comparison was price per square foot; it is not clear whether he used net rentable square feet or gross square feet. (*Id.* at 33.) Newkirk analyzed three sales and two listings of medical office properties, four sales of office properties (including one medical office), and four sales of restaurant properties. (*Id.* at 36-61 46.) He made quantitative adjustments for differences including construction class, age, size, zoning, location/access, and conditions of sale, as well as qualitative determinations. (*Id.* at 35-36.) Newkirk's adjustments included "[t]ime adjustments * * * based on an indicated appreciation rate of 4.5%, up to the January 1, 2009[,] (no adjustment for 2009)." (*Id.* at 45, 53, 61.)

Newkirk's medical office sales and listings range in size from 2,715 to 104,856 square feet. (Def's Ex A at 42.) The properties are located in Corvallis, Hillsboro, and Cedar Mill, and all are single use medical office properties with the exception of listing 4, which includes 4,779 square feet of retail space. (*Id.* at 40, 42.) The three sales occurred in April 2008, June 2008, and September 2009. (*Id.* at 42.) Unadjusted prices per square foot range from $249 for listing 4

to $315 per square foot for sale 2, a 104,856 square foot medical office in Hillsboro. (*Id.*)

Newkirk's adjusted prices per square foot range from $244 to $414. (*Id.* at 45.) He concluded

$360 per square foot for the first three floors of the subject property for a value of $4,950,000.[10]

(*Id.*)

Newkirk's office sales range in size from 3,918 to 51,110 square feet and are located in

Corvallis, Salem, Tigard, and Eugene. (Def's Ex A at 50.) The properties are all are single use

office properties; sale 1 is a single use medical office located in Corvallis. (*Id.* at 46, 50.) The

sales occurred in November 2007, April 2008, May 2008, and November 2009. (*Id.* at 50.) The

unadjusted prices per square foot range from $207 to $259; the adjusted prices per square foot

range from $218 to $266. (*Id.* at 53.) Newkirk concluded a value of $310 per square foot and

determined a value of $1,430,000 for the subject property fourth floor.[11] (*Id.*)

Newkirk's restaurant sales range in size from 3,093 to 11,472 square feet and are located

in Corvallis, Woodburn, and Eugene. (Def's Ex A at 58.) The sales occurred in December 2005,

September 2008, January 2009, and February 2010. (*Id.*) The unadjusted prices per square foot

range from $174 to $404; the adjusted prices per square foot range from $177 to $459, with an

average of $241 per square foot. (*Id.* at 61.) Newkirk determined a value of $300 per square

foot or a value of $2,140,000 for the subject property fifth and sixth floors.[12] (*Id.*) Newkirk

/ / /

/ / /

---

[10] Newkirk's value conclusion is based on the 13,755 gross square feet. (Def's Ex A at 45.)

[11] Newkirk's value conclusion is based on 4,617 gross square feet. (Def's Ex A at 53.)

[12] Newkirk's report states that the value of $300 per square foot was applied to "the Fourth floor of regular office space." (Def's Ex A at 61.) However, the fourth floor of the subject property is office and Newkirk determined its value under his sales comparison approach on page 53 of his report. (Def's Ex A at 53.) Newkirk's value conclusion is based on 7,143 gross square feet. (*Id.* at 61.)

added the values for each type of space for a total value of $8,520,000. (*Id.* at 62.) He subtracted the value of parking, $400,000,[13] for a total value of $8,100,000. (*Id.* at 62-63.)

Carone testified that Plaintiff purchased the subject property on June 3, 2009, for $3,259,000, of which about $600,000 was for personal property. (*See* Ptf's Ex 1 at 2.) He testified that the previous owner of the subject property had opened a spa and restaurant in the subject property in April 2008 and both closed in December 2008 or January 2009. Dickerhoof testified that he considered purchasing the subject property in 2008 for $3.5 million. He testified that investors considering whether to purchase a property such as the subject property focus on what rents can be achieved. Dickerhoof testified that the first three floors of the subject property are very nice, but not very usable; they would probably have to be converted to medical offices. He testified that the typical cost to "reposition" a property is about $30 per square foot. Dickerhoof testified that he considered the "effective cost" to purchase the subject property to be $4.2 million, which was not a worthwhile purchase.

Newkirk testified that there is some evidence that the 2009 sale of the subject property was a distress sale, including a March 8, 2009, newspaper article in the Corvallis Gazette Times describing the foreclosure of the subject property in 2009 as a result of the previous owner's financial troubles. (*See* Def's Ex A at 88-92.) Newkirk noted that:

> "local commercial broker Gary Pond calculate[d] a buyer would need to charge monthly rents of $3.85 per square foot to net a modest 6 percent return on investment. * * *. 'There is nothing renting near that rate in the downtown, and even the new projects on Ninth Street haven't broken $3,' Pond said in an email. Assuming the building was fully leased at an average monthly rate of $2 per square foot, Pond said, a buyer could make the deal pencil out at a sale price of around $8.5 million."

---

[13] Newkirk noted that the comparable sales all included "ample parking," so he subtracted the value of parking, which he calculated by multiplying the space required for the subject property parking, 9,088 square feet, by $44 per square foot for parking, determined based on his land value. (Def's Ex A at 62.)

(*Id.* at 92.) Dickerhoof testified that he did not think the subject property was a distressed sale; it was listed by a well-known Portland company and several groups were looking at it.

E.     *Cost approach; reconciliation*

Zenker testified that he did not place much weight on the cost approach because the subject property is very unique and suffers from external obsolescence in the range of 56 to 58 percent.[14] (*See* Ptf's Ex 1 at 47-48.) He testified that the subject property "also has superadequacy issues as it relates to the amount of interior improvements present in the property." (*See Id.* at 48.) To determine the value of the subject property land, Zenker identified four comparable land sales in 2006 and 2007 and two land listings in Corvallis. (Ptf's Ex 1 at 36.) He made qualitative adjustments and determined prices per square foot ranging from $18.50 to $54.15, with an average of $33.70. (*Id.* at 38.) Zenker concluded a price per square foot of $33 for the subject property land as of January 1, 2010, and concluded a land value of $160,000. (*Id.* at 43-44.) Using Marshall Valuation Service, Zenker determined a replacement cost new of $7,999,517 for the subject property structures as of January 1, 2010. (*Id.* at 49.) Including "age/life" and economic (external) obsolescence, he concluded the depreciated improvements value to be $3,437,548. (*Id.* at 51.) Zenker separately analyzed the value of the site improvements under the cost approach and concluded a value of $11,906. (*Id.* at 51-53.) He subtracted lease-up costs of $701,772 for a total indicated value of $2,907,682 under the cost approach. (*Id.* at 56.) Zenker determined a reconciled "as is value" of $2,900,000 as of January 1, 2010.[15] (*Id.* at 104.)

/ / /

---

[14] Zenker calculated external obsolescence based on the disparity between the replacement cost new of the subject property improvements and the value conclusion under the other approaches of value. (Ptf's Ex 1 at 47-48.)

[15] As of January 1, 2009, Zenker determined a reconciled "as is value" of $3,510,000 for the subject property. (Ptf's Ex 1 at 104.)

Newkirk searched for land sales in the Central Business and Riverfront zones and identified five "potentially" comparable sales, including the sale of the subject property land on November 14, 2003,[16] and two listings. (Def's Ex A at 23, 24.) Not including the sale of the subject property land in 2003, Newkirk's land sales occurred in 2005, 2006, and 2007. (*Id.* at 24.) Newkirk's unadjusted prices per square foot ranged from $23.91 to $70.94; the adjusted prices per square foot ranged "from $32.01 to $83.71, with an average of $74.37 per square foot." (*Id.* at 27) Newkirk concluded a value of $60.00[17] per square foot, or $290,000, for the subject property land. (*Id.*) He valued the subject property improvements using Marshall & Swift Cost Valuation Service and calculated a replacement cost new of $8,691,061, including a cost of $141,075, or 1.65 percent, for LEED's materials and certification.[18] (*Id.* at 29-31.) Newkirk determined a depreciated replacement cost of $8,473,785 for the subject property improvements and a total value of $8,760,000 under the cost approach. (*Id.* at 31, 32.) Newkirk testified that he gave the most weight to the income and sales comparison approaches and determined a reconciled value of $8,210,000. (*See id.* at 84-85.) At trial, Defendant's appraiser revised his 2010-11 real market value to, approximately, $6,450,000.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11

---

[16] Plaintiff offered evidence on rebuttal that the subject property was not bare land at the time of the 2003 sale; it included a building. (Ptf's Ex 18, 19.) Newkirk testified that, even if the subject property included a building at the time of the 2003 sale, the purchase was effectively for land only because the buyer intended to demolish the existing building.

[17] The figure appears to be a typographical error. In the exhibit Newkirk concludes a value of $64.00 per square foot, but uses the value of $60.00 per square foot in his calculations

[18] Newkirk determined that the subject property improvements are "substantially complete in designation requirements, materials, and workmanship in obtaining LEED's Certified Silver status. According to 'Building Operating Management', the November 2008 issue, the LEED premium addition to project costs will range from 1 to 3.3%." (Def's Ex A at 30.) Newkirk testified, however, that it is his understanding that the subject property's LEED certification is not yet complete. (*See id.* at 7.)

tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[19]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210. Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2); *See* OAR 150-308.205-(A)(2)(a). There are three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a). The approach of valuation to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue.*, 286 Or 529, 533 (1979). Both parties placed most weight on the income approach and the sales comparison approach. Although both parties determined a value under the cost approach, neither party gave that

///

---

[19] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

approach much weight. The court agrees that the income and sales comparison approaches should be given the most weight.

A.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) [NOI.]" *Id.* at 253. "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254, citing Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001). "A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Id.* at 260.

Determining market rent for the subject property as of January 1, 2010, is particularly challenging in this case given that the subject property was not stabilized as of January 1, 2010; there are few good rent comparables for the subject property spa; and it is not clear that the highest and best use of the fifth and sixth floors are as a restaurant. Zenker identified retail rent comparables, including one spa, and concluded market rent to be $2.30 for the first floor and $2.05 for the second and third floors of the subject property. Using office rent comparables, Zenker concluded rent of $2.25 per square foot per month for the fourth floor and $2.30 per square foot per month for the fifth and sixth floors. Those conclusions are supported by the

/ / /

testimony of Dickerhoof that office space leases at $1.50 to $1.60 per square foot and retail

properties lease at $1.00 per square foot to $2.15 per square foot.

Newkirk determined rent of $2.83 per square foot per month for first three floors of the

subject property based on medical office leases and $2.50 per square foot per month for the

fourth floor of the subject property based on office lease comparables.[20] The highest unadjusted

lease rate for either medical office or office rent comparables identified by Newkirk was $2.36

per month, with the exception of a lease listing at $2.45 per month. Newkirk determined rent of

$3.13 per square foot per month for the fifth and sixth floors of the subject property based on

three restaurant leases. The highest unadjusted lease rate for the restaurants identified by

Newkirk was $2.50 per square foot per month for a Baja Fresh in Corvallis. It is difficult to

understand how the subject property could command rents higher than any of the properties

identified as comparables. The court finds that Zenker's conclusion that the highest and best use

of the fifth and sixth floors of the subject property is as office space is supported. The court

further finds that the evidence presented supports the market rents concluded by Zenker and

accepts his calculation of gross income of $566,660 as of January 1, 2010.

Both Zenker and Newkirk agreed that stabilized vacancy and credit loss was five percent

as of January 1, 2010. The court accepts their determinations as reasonable in this case. Zenker

relied on the subject property's actual expenses and concluded total expenses, including property

taxes, of 36.88 percent. He reported "total operating expenses" not including property taxes of

32.29 percent, but that figure appears to be a typographical error; the correct figure for operating

expenses, not including property taxes, is 24.33 percent, as Zenker concluded for the 2009-10 tax

---

[20] Newkirk testified that he relied on medical office comparables for the subject property spa space because it was difficult to find spa comparables, not because he considered use as a medical office to be the highest and best use. Dickerhoof testified that, had he purchased the subject property in 2009, he would have repositioned the first three floors of the subject property to medical offices, but the cost would likely be $30 per square foot.

year.  Newkirk concluded expenses of 25 percent for the first through fourth floors of subject property and concluded four percent expenses for the fifth and sixth floors.  "This court has indicated a preference for an income approach that removes property taxes from expenses * * *." *Morse Hays LLC v. Benton County Assessor*, TC-MD No 100697C at 9 (July 5, 2011).  The court finds that reasonable expenses for the subject property, not including property taxes, were 25 percent as of January 1, 2010, for NOI of $403,745.

"A cap[italization] rate is generally calculated using market sales." *Allen*, 17 OTR at 260.  The capitalization rates of Zenker's comparable sales in 2009 ranged from 8.14 to 8.40 percent.  He also reported that the Korpacz fourth quarter 2009 investor survey stated average capitalization rates of 8.75 percent for the national office market and 9.30 percent for the Pacific Northwest market.  The capitalization rates of Newkirk's office and medical office comparable sales, which occurred between November 2007 and August 2009, ranged from 6.5 to 8.85 percent.  Both Zenker and Dickerhoof testified that a capitalization rate at the higher end of the range is appropriate for the subject property because it is a mixed use property and, therefore, presents more risk.  The court accepts that testimony and finds that a capitalization rate of 8.50 percent[21] is appropriate for the subject property as of January 1, 2010, for a value of $4,750,000. The court accepts Newkirk's calculation of $400,000 for parking costs, and concludes a value of $4,350,000 for the subject property under the income approach as of January 1, 2010.

B.      *Sales comparison approach*

"In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

OAR 150-308.205-(A)(2)(c).  "The court looks for arm's length sale transactions of property

---

[21] The court did not receive any evidence of the tax rate.

similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, WL 21263620 at *3.

Zenker identified sales 2, 3, and 6 as his best comparable sales for the subject property, each of which he identified as "overall inferior" to the subject property. His comparable sale 5, with an unadjusted sale price of $237.56 per square foot and an adjusted price per square foot of $196.75 was the only comparable sale that he considered "overall superior" to the subject property. Newkirk identified medical office, office, and restaurant sales as comparable sales for the various floors of the subject property. The court finds that Newkirk's restaurant sales are not good comparables for the subject property. Newkirk's sales from 2007 and the first half of 2008 are less helpful in determining the real market value of the subject property as of January 1, 2010, and it is not clear why those sales were adjusted upward at 4.5 percent per year for time/market conditions. Of the medical office and office sales identified by Newkirk, the court finds that the unadjusted listing price of a medical office in Corvallis (listing 3) at $276.17 per square foot likely sets the upper end of the range of values for the subject property. The unadjusted prices per square foot of Newkirk's office sales range from $207 to $259; all of those sales occurred before the January 1, 2010, assessment date. Based on the market evidence presented, the court finds that the value indicated for the subject property is $195 per square foot, for a value of $4,181,000 based on the net rentable area of the subject property.[22]

C.      *Lease up costs*

Zenker determined that $701,771 in lease up costs, including tenant improvements ($25/SF) and entrepreneurial profit (10%), should be subtracted from the value conclusion under the income approach because the subject property was not stabilized as of January 1, 2010. In

_____

[22] Zenker adjusted his comparable sales for the lack of parking at the subject property, so no additional subtraction of parking costs is required.

*Kailes v. Josephine County Assessor* (*Kailes*), 16 OTR-MD 348 (2001), this court addressed the appropriateness of "an adjustment for so-called 'stabilization costs,'" including lost rent, leasing commissions, and tenant improvements. *Id.* at 353. The court ultimately allowed an adjustment for rent loss, calculated based on the approach recommended by *The Appraisal of Real Estate*.[23] *Id.* at 356-57. However, the court in *Kailes* found that the property at issue was a "problem property" based on the unusual length of time that the property at issue had "remained vacant and for sale" without any offers and the associated market stigma. *Id.* at 355. There is no evidence before the court suggesting that the subject property is a "problem property" which cannot be leased or sold. Based on the testimony of Carone and Dickerhoof, there were several investors interested in purchasing the subject property in 2009. Furthermore, 81.2 percent of the subject property was occupied as of January 1, 2009; the higher vacancy as of January 1, 2010, was due to the closure of the restaurant located on the fifth and sixth floors. Accordingly, the court finds that an adjustment for lease up costs is not appropriate in this case.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the real market value of the subject property as of January 1, 2010, was $4,250,000. Now, therefore,

/ / /

/ / /

/ / /

/ / /

---

[23] "*The Appraisal of Real Estate* discusses rent loss in the context of a proposed multi-tenant project that is not fully leased. In that situation, the authors note that '[t]he appraiser should account for the impact of the rent lost while the building is moving toward stabilized occupancy.' Several approaches are set forth regarding how the appraiser can account for the loss of rent. One recommended technique is to 'discount[ ] the net income loss during lease-up, which is then deducted from the value of the property at stabilized occupancy.'" *Kailes*, 16 OTR-MD at 356 (internal citations omitted).

DECISION TC-MD 110559N                                                                                     22

IT IS THE DECISION OF THIS COURT that the real market value of property

identified as Account 417374 was $4,250,000 for the 2010-11 tax year.

Dated this ____ day of March 2012.

_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE


***If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.***

***This document was signed by Magistrate Pro Tempore Allison R. Boomer on March 22, 2012.  The Court filed and entered this document on March 22, 2012.***